**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a1007n.06

**No. 12-4424**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Dec 02, 2013

DEBORAH S. HUNT, Clerk

ANGELA POWELL-PICKETT, )
  )
  Plaintiff-Appellant, )
  )   ON APPEAL FROM THE UNITED
v. )   STATES DISTRICT COURT FOR THE
  )   SOUTHERN DISTRICT OF OHIO
A.K. STEEL CORPORATION, )
  )
  Defendant-Appellee. )
  )

Before:  BOGGS and SUTTON, Circuit Judges, and CLELAND, District Judge.[*]

CLELAND, District Judge.  December 20, 2011, was a defining day for Appellant Angela Powell-Pickett.  That morning she sat for a deposition in her lawsuit against her former employer, Appellee AK Steel, which she was accusing of discrimination, retaliation, and harassment.  It was the third deposition scheduled for her; she had (apparently) fainted during the first and had not shown up to the second.  On her important day, at the third deposition, she dissembled.  When she was asked if she had ever filed another lawsuit, she said she did not recall.  Confronted with her own resume, and asked whether she had made it, she said she did not recall.  She answered almost every question this way.  Asked in what decade (*decade*) she had left a previous employer, she said she did not recall.  When she was asked repeatedly what discrimination, retaliation, and harassment she had suffered, she said that she had no idea.  Although she became agitated when shown glaring

---

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

inconsistencies in a bankruptcy petition she had filed, she was not berated or otherwise coerced. She

simply refused to testify about her own case.[1]

After AK Steel moved for summary judgment, Powell-Pickett submitted an affidavit in

which she declared that she had endured "a very, very, very hostile work environment" and in which

she provided examples of alleged mistreatment. Although her lawyer speculated on her behalf, she

herself offered no explanation for the return of her memory. The district court struck the affidavit

because it contradicted Powell-Pickett's sworn testimony and then, finding no dispute of material

fact, granted AK Steel's motion. Seeking to undo what she did on a very important day, Powell-

Pickett appeals.

## I. BACKGROUND

The chain of events leading to this appeal begins in February 2006, when a collective

bargaining agreement between AK Steel and a steelworkers union expired. AK Steel locked out the

union workers and hired replacements, of which Powell-Pickett was one. As part of her application

Powell-Pickett underwent a medical exam, reported her medical history, and swore to her reported

medical history's completeness and accuracy. In her application she reported no medical issues and

no workplace injuries—claims that were to become important. At the time, all went smoothly,

however, and Powell-Pickett started work as an inspector of a production line in AK Steel's largest

plant. She reported to a shift manager, who in turn reported to a supervisory manager, William

Belding. In July 2007, after the lockout ended, Belding hired Powell-Pickett as a permanent

---

[1]Her approach brings to mind the attitude of Bartleby, the title character of a Melville short story, who reflexively responded to every request, "I would prefer not to." *See* Herman Melville, *Bartleby, the Scrivener: A Story of Wall Street* (1853).

employee; she remained an inspector. She says that to become a regular worker she had to undergo another medical exam and that during this exam she told the doctor her full medical history. That history includes an old workplace injury, a thyroid condition, and the removal of a cyst.

In September 2007 Powell-Pickett applied to become a shift manager. The following January, however, Belding awarded the position to someone else—someone who is, like Powell-Pickett, black, female, and a former replacement worker. The day she learned of Belding's choice, Powell-Pickett called AK Steel's ethics hotline and complained that Belding had based his decision on favoritism, promoting a person he had trained. AK Steel investigated and found the complaint groundless. Two months later, in March 2008, Powell-Pickett submitted a charge of discrimination to the EEOC. *See* R. 59 at 6, n.5 (discussing Powell-Pickett's shifting assertions about when she filed an EEOC charge and concluding, based on a statement in her response to summary judgment, that only her claim of March 2008 is coherent). She objected to missing the promotion, alleged that she was being assigned shifts unfairly, and claimed that she was suffering retaliation for calling the ethics hotline. In June 2008, a supervisor sent Belding and others an email with pointed questions about Powell-Pickett's schedule. The email did not mention harassment. Apparently the EEOC charge did not either. Both focused on shift assignments and asserted that Powell-Pickett had been demoted to a "floater" position. AK Steel says Powell-Pickett was merely rotated among different lines, for training, after she became a regular worker. At any rate, in mediation conducted by the EEOC, Powell-Pickett agreed not to sue, and AK Steel agreed to forget about the EEOC charge.

In February 2009, Powell-Pickett submitted a doctor's note saying that, due to an irritable bowel, back pain, and anxiety, she needed a month's leave. AK Steel granted the time but, in accord

with company policy, required Powell-Pickett to attend a medical exam before returning to work. At the exam, Powell-Pickett raised the old work injury, the thyroid condition, and the removed cyst. AK Steel promptly suspended her, and then terminated her, for providing an incomplete medical history in 2006. She is one of about thirty people at her plant fired in the 2000s for giving AK Steel false information. The union at first challenged the termination, but, in the end, it declined to seek arbitration.

Powell-Pickett filed another EEOC charge and, in May 2010, began this action. In a fifteen-count complaint, she alleged discrimination, harassment, and retaliation based on race and gender, in violation of Title VII and duplicative Ohio law. She also alleged a violation of the Family Medical Leave Act ("FMLA"), as well as breach of a contract (the EEOC mediation agreement). According to the complaint:

> During the fall of 2007, Plaintiff began being discriminated against and harassed because of her race and gender. She was subjected to racial slurs and sexist comments. Plaintiff was subjected to unwelcome and offensive touching. Her locker was sprayed with profanity directed at [her] gender. An employee urinated in containers and placed them in the ceiling above Plaintiff. A noose was found hanging in her work area. Offensive photographs, pictures and posters were displayed on the lockers of others.

R. 1 at ¶ 18. The complaint also asserts that a nurse's erroneous instructions caused Powell-Pickett to provide the incomplete medical history.

Powell-Pickett's first deposition occurred in June 2011. It was, it is fair to say, a shambles. AK Steel's counsel began by asking Powell-Pickett questions about her conduct shortly after her termination. In July 2009, a few months after she lost her employment, she filed for her third bankruptcy under Chapter 13, which "authorizes an individual with a regular income to obtain a

discharge after the successful completion of a payment plan," *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007); distinct from Chapter 7's *trustee*-in-possession schema, Chapter 13 allows the debtor to "retain[] possession of his property," *id.* In her petition, she declared an ongoing salary from AK Steel. Counsel pressed her to explain why she had told the bankruptcy court that she still had an income. Soon, Powell-Pickett was claiming not to recognize documents that minutes earlier she had acknowledged signing under penalty of perjury. Things drew to a close when, after less than half an hour, she said she could not recall declaring bankruptcy, asked for a break, fainted, and was removed by the paramedics. A few weeks later, her attorneys withdrew on the ground that "a lawyer may withdraw from representing a client if the client insists upon taking action . . . with which the lawyer has a fundamental disagreement." R. 14 (quoting Rule 1.16(b)(4), ABA Model Rules of Professional Conduct).

After Powell-Pickett missed the second deposition, the district court ordered her to appear at the third. It began much like the first: AK Steel's counsel asked about Powell-Pickett's bankruptcy papers, and Powell-Pickett claimed to remember nothing. She eventually gave some direct answers, saying, for instance, that a nurse had told her to report only her recent medical history in her 2006 application. But she rejected every invitation to explain how she had been mistreated. Near the end there occurred the following exchange:

> Q. Why do you believe Bill Belding discriminated against you? Tell the court why.
>
> A. Because I was a replacement worker.
> . . . .
> Q. Any other reason why you think he discriminated against you besides you were a replacement worker?

A.   I don't recall at this time.

Q.   Okay.  Any other reasons why you think that Bill Belding discriminated against you?

A.   Don't recall at this time.

Q.   Okay. Any other reasons why you think that Bill Belding harassed you because of your race?

A.   Retaliation.
. . . .

Q.   All right.  Well, . . . tell me how he harassed you because of your race.

A.   I don't recall at this time.

Q.   Okay.  Tell me how he retaliated against you because of your race.

A.   I don't recall at this time.

Q.   Okay.  Tell me why you think anybody in supervision at AK Steel discriminated against you because of your race.

A.   I don't recall at this time.

Q.   Tell me why you think anybody in management at AK Steel discriminated against you because of your gender.

A.   I don't recall.

Q.   Okay.  Tell me why you think anybody in AK Steel management retaliated against you because of any protected activity you engaged in.

A.   Don't recall.
. . . .

Q.   What proof do you have . . . that the company fired you because of your filings with the EEOC?

A.   That's just what I feel.

Q.   Do you have any other reason why you feel that way?

A.      I have plenty of reasons.

Q.      Well, now is the time to tell them.

A.      Don't recall them at this time.

R. 35 at Dep. 82-85.

Powell-Pickett's present attorney entered the case, and AK Steel moved for summary judgment. Powell-Pickett supported her response in opposition with affidavits from herself, two co-workers, and a supervisor, the one whose June 2008 email on her behalf raised only scheduling issues. These affidavits affirmed the complaint's main allegations of mistreatment, and they added that a co-worker had touched Powell-Pickett's hair, that a manager had called her "Buckwheat," and that a couple managers had spread rumors that she was once a "hooker in Alaska." AK Steel moved to strike Powell-Pickett's affidavit and hold her to her testimony under oath.

Observing simple facts—that Powell-Pickett lost a promotion to a fellow former replacement worker who was both female and black; that no record evidence showed management discovering the worst alleged wrongs (the noose, the urine); and that Powell-Pickett's deposition and subsequent affidavit were irredeemably inconsistent—the district court granted the motion to strike and the motion for summary judgment.

## II. STANDARD

We review the decision to strike an affidavit for an abuse of discretion. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006). And we review the grant of summary judgment

*de novo*, drawing each reasonable inference in favor of the non-moving party. *Entm't Prods., Inc. v. Shelby Cnty., Tenn.*, 721 F.3d 729, 733 (6th Cir. 2013). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a mater of law." Fed. R. Civ. P. 56(a).

### III. DISCUSSION

### A. The Motion to Strike

When a party says one thing live at a deposition but another thing in a written statement, the change is conspicuous. The written words—often composed by the party's lawyer—look too contrived to deserve any weight. The rule therefore is that a party opposing summary judgment with an affidavit that contradicts her earlier deposition must explain why she disagrees with herself. *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012). Although in this case it seems equally likely that the plaintiff simply lied under oath, *see*, *e.g.*, *Battaglia v. United States,* 653 F.2d 419, 421 (9th Cir. 1981) ("A witness who testified that he does not remember an event can be convicted of perjury if it can be proven . . . that he does, in fact, remember the event."), as that she filed a contrived affidavit, in either event a convincing explanation of the conflicting evidence is required. A party may neither duck her deposition, nor hold her cards in anticipation of later advantage.

Powell-Pickett resists the conclusion that she even contradicted herself. She contends that her affidavit did no more than supplement her deposition, at which, she claims, she just lacked "skill in presenting facts." That is not accurate, however; she said next to nothing. She rejected each of many chances to provide the basics of her lawsuit. It is "impossible logically to distinguish between

the case of a downright refusal to testify and that of evasion by obvious subterfuge and mere formal compliance." *United States v. Appel*, 211 F. 495, 495 (S.D.N.Y. 1913) (L. Hand, J.). A deponent who professes a comprehensive and incredible lack of memory in fact declines to present evidence. Because Powell-Pickett was asked specific questions about, yet denied knowledge of, the material aspects of her case, the material allegations in her affidavit directly contradict her deposition.

The district court may not strike an affidavit if "the alleged inconsistency [it] created . . . existed within the deposition itself." *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 593 (6th Cir. 2009). Powell-Pickett argues that her deposition contradicts itself and that her affidavit is a permissible clarification. She focuses this argument on the FMLA claim, a claim that was barely discussed at the deposition, and a claim that, as we shall see, fails regardless. So far as she employs the argument for her claims of mistreatment based on race or gender, she is mistaken. Only once did she come close to discussing these claims. When counsel asked what problems she had had with Belding, she said, "harassment, discrimination, retaliation." When counsel then asked her to say what mistreatment she had suffered, she said instead why she thought mistreatment had occurred—because of the EEOC charge. That oblique response does not conflict with the direct answer, "I don't recall," that Powell-Pickett habitually gave when asked, again and again, to say what AK Steel had done to her.

Powell-Pickett says the hard questioning by AK Steel's counsel would cause any person uneducated in the law to become forgetful or silent. But she submits no evidence that *she* felt that way; her lawyer merely speculates. *See* Fed. R. Civ. P. 56(c)(1). Actually there is no sign that she suffered harsher questioning than a reasonable person can handle. And she never expressed fear or

stopped answering questions altogether.  Counsel reminded her of her oath to speak the truth and

of the importance of speaking up ("now is the time").  And although at times she plainly withdrew,

she did so mainly when presented with her own apparent lies or inconsistencies.  Under the

circumstances, her lack of memory about the alleged wrongs she suffered was too complete to

appear unintended.  No one suppressed or hoodwinked her.  She made no disguise of the fact that

in support of her case, she just had nothing to say.

## B. The Motion for Summary Judgment

The law of harassment is indifferent to a plaintiff who did not herself regard workmates'

conduct as abusive.  *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 878–79 (6th Cir. 2013).

Although there exists some evidence of objectively cruel behavior, Powell-Pickett, principal

saboteur of her own deposition, made a record bereft of evidence that she considered her workplace

hostile or offensive.  She would invite a fact finder to guess at what she witnessed and how she felt;

her harassment claim therefore fails.  In any case, if a plaintiff alleges harassment by a co-worker,

rather than a supervisor, only conduct the employer knew or should have known about can create

liability.  *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005).  No evidence

establishes that Powell-Pickett reported the noose or the urine planting at her work station.  She now

says that she mentioned both to a supervisor, the one who sent an email for her complaining about

her schedule, but she said nothing whatever about this at her deposition.  The supervisor, who also

submitted an affidavit, says nothing about it either.  Most of the other allegations of harassment are

either supported only by vague assertion in an affidavit or are unsupported altogether.  *See Bsharah*

*v. Eltra Corp.*, 394 F.2d 502, 503 (6th Cir. 1968) ("In summary judgment proceedings, affidavits

containing mere conclusions have no probative value."); *see also Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 501 (6th Cir. 2009); 10B Charles Alan Wright & Arthur R. Miller, *et al.*, *Federal Practice & Procedure* § 2738 n.33 (3d ed. 2013).  The allegations that are supported—the name-calling ("Buckwheat"), the rumor-spreading ("hooker in Alaska"), and the touching of Powell-Pickett's hair—constitute sporadic mean conduct but not the severe or pervasive harassment of a hostile work environment.  *See Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 512–13 (6th Cir. 2011).

Powell-Pickett argues that AK Steel discriminated against her by not promoting her to shift manager, by scheduling her work shifts unfairly, and by terminating her.  Her complaint about not becoming shift manager fails because she lost the promotion to someone of the same race and gender.  *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363–64 (6th Cir. 2010).  She says Belding undercut her by not training her, but she cites no record evidence, and anyway her point is a red herring; it remains the case that Belding treated favorably the black female whom he promoted. Powell-Pickett objects to being scheduled as a "floater," but she never rebuts AK Steel's reasonable claim that she was merely being trained to inspect different production lines.  *See Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008).  She says Belding refused her requests for time off, but again she ignores a reasonable explanation—that she always sought leave too late, after Belding set the week's shift schedule.  Although she claims that AK Steel terminated her because of her race or her gender, she identifies no one of a different race or gender who replaced her.  *See Younis*, 610 F.3d at 363–64.  She never establishes, moreover, that AK Steel used the omitted parts of her medical history as a mere pretext for dumping her.  *See Russell*, 537 F.3d at 604.  She says both that

a nurse told her what to omit and that she first gave AK Steel her full history long before she lost her job. These allegations do not help her, because no evidence suggests that AK Steel's mistakes, if any, in firing her served as cover for animosity. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007).

An employer may not retaliate against an employee who objects to potential workplace discrimination. *Warf*, 713 F.3d at 880. Powell-Pickett's first protected objection was her call to the ethics hotline after she missed the promotion, so the promotion decision itself could not have been retaliation. The unsupported claim that Powell-Pickett was deprived of training, the rebutted claim that she was scheduled unfairly, and the unsupported and rebutted claim that she was vindictively terminated, all reveal no sign of retaliation. And because she never shows that AK Steel retaliated, Powell-Pickett cannot establish retaliation based on her EEOC charge. There was therefore no breach of contract.

Finally, the FMLA claim. When responding to the motion for summary judgment, Powell-Pickett treated it as an afterthought. She quoted two affidavits saying that she had needed FMLA leave after her daughter had knee surgery, but she offered no law and no analysis. The district court, which could easily have found the claim forfeited, decided that Powell-Pickett raised an FMLA claim based on the need to care for her daughter, and it then concluded, correctly, that she had not shown she was denied requested leave. Powell-Pickett says that "the framing of the issue by the district court was in error"—this of an issue that Powell-Pickett did not frame at all. She raises parts of the record that she never mentioned to the district court and tries to revive her neglected claim on appeal. That she may not do. The district court need not search the record for probative evidence

a party fails to identify, and the court of appeals need not consider facts never presented to the district court. *Street v. J.C. Bradford & Co.* 886 F.2d 1472, 1479–1480 (6th Cir. 1989); *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007); *Tucker v. Tennessee,* 539 F.3d 526, 531 (6th Cir. 2008); Fed. R. App. P. 28(a)(7) and (e); 6th Cir. R. 28(a).

## IV. CONCLUSION

The judgment of the district court is AFFIRMED.